**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **JENNIFER THOMAS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **No. 11 C 8956** |
| **v.** ) | |
| ) | **Magistrate Judge Michael T. Mason** |
| **CAROLYN W. COLVIN, Acting** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

**MEMORANDUM OPINION AND ORDER**

Michael T. Mason, United States Magistrate Judge:

Claimant Jennifer Thomas ("Thomas" or "claimant") brings this motion for

summary judgment [22] seeking judicial review of the final decision of the Commissioner

of Social Security (the "Commissioner"). The Commissioner denied Thomas' claim for

Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under

the Social Security Act (the "Act"), 42 U.S.C. §§ 416(i), 423(d) and 1382(c)(a)(3)(A).

The Commissioner has filed a cross-motion for summary judgment [27], asking that the

Court uphold the decision of the Administrative Law Judge ("ALJ"). This Court has

jurisdiction to hear this matter pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the

reasons set forth below, claimant's motion for summary judgment is granted in part and

denied in part and the Commissioner's cross-motion for summary judgment is denied.

**I.     BACKGROUND**

**A.     Procedural History**

Thomas filed her applications for DIB and SSI in October of 2007. In both

applications, Thomas alleged an onset of disability of October 2, 2005. (R. 124-26,

129-35.)  The Social Security Administration denied her applications initially on July 24, 2008, and again upon reconsideration on December 23, 2008.  (R. 93-101.)  Thomas filed a timely request for a hearing on January 28, 2009.  (R. 104-05.)  On March 2, 2010, Thomas appeared with counsel before ALJ Marlene R. Abrams.  (R. 623.)  On April 16, 2010, ALJ Abrams issued a written decision denying Thomas' request for benefits.  (R. 6-21.)  Thomas filed a timely request for review.  On October 26, 2011, the Appeals Council denied the request, making the ALJ's decision the final decision of the Commissioner.  (R. 2-5); *Estok v. Apfel*, 152 F.3d 636, 637 (7th Cir. 1998).  This action followed.  The parties consented to this Court's jurisdiction pursuant to 28 U.S.C. § 636(c) [19].

### B.    Medical Evidence

Claimant began receiving treatment for physical and mental impairments after she was involved in a motor vehicle accident in June of 2005.  (R. 638-40.)  She seeks DIB and SSI for disabling conditions stemming from pain associated with back, neck, and shoulder injuries, as well as chronic pain radiating throughout various parts of her body.  (R. 14.)  She also suffers from insomnia, depression, and anxiety.  (*Id.*)

### 1.    Treating Physicians

On June 13, 2005, following her automobile accident, Thomas sought treatment at Saint Margaret Mercy Healthcare Center.  (R. 350.)  She received an x-ray of her right shoulder, which showed no fracture or dislocation.  (*Id.*)  An x-ray of her cervical spine demonstrated reversal of normal cervical lordosis with apex of reversal greatest at the C5-6 level.  (R. 351.)  However, the disc spaces were well preserved, and there was no sign of fracture or dislocation.  (*Id.*)  Claimant underwent an x-ray of her thoracic

spine on August 17, 2005, which showed no evidence of a compression fracture or significant subluxation. (R. 348.) Claimant received an MRI of the cervical spine on October 10, 2005. (R. 346.) It too showed a slight reversal of the normal lordotic curve, unchanged since June 13, 2005. (*Id.*) There was no evidence of herniated disc, osteophyte formation, or neural foraminal narrowing. (*Id.*)

Claimant sought treatment at Northern Indiana Neurological Institute on November 28, 2005 for severe pain in her right arm and left elbow, as well as back pain. (R. 311.) The examining physician recommended an MRI, an Electromyography ("EMG"), and physical therapy. (*Id.*) The EMG revealed normal results. (R. 320.) An MRI of the thoracic spine showed degenerative disc disease at T6/7 with a mild to moderate left paracentral disc hernation with a slight superior migration and mild cord flattening. (R. 318-19.) Disc degeneration with slight generalized disc bulging was seen at T9/10. (R. 318.) There was no significant thoracic canal or foraminal stenosis at any level and the thoracic spinal cord demonstrated normal signal intensity. (*Id.*) Ultimately, Thomas was referred to the University of Chicago ("U of C"). (R. 313.)

Thomas presented to the U of C Women's Health Center on December 20, 2005 complaining of upper neck pain and left arm pain. (R. 389.) She reported that she was recently diagnosed with a superficial thrombophlebitis and had been taking Plavix for treatment. (*Id.*) She also reported receiving injections in her neck and left arm several weeks prior. (*Id.*) Mild swelling of the left elbow was observed. (*Id.*) Thomas underwent an upper extremity doppler scan, which showed a brachiocephalic thrombus. (R. 388.) Thomas was prescribed Lovenox. (*Id.*)

Also at this time, claimant began seeing primary care physician Dr. Neda

Laiteerapong.  (R. 403.)  Dr. Laiteerapong reported that Thomas' complaints of numbness and tingling were thought to be due to carpal tunnel syndrome and she was advised to wear splints.  (*Id.*)  She was also diagnosed with anxiety and depression and started on Lexapro.  (*Id.*)

Thomas saw Dr. Alex Ulitsky at U of C on March 14, 2006.  (R. 392.)  She reported that the blood clot still caused significant pain in her left arm, and complained of soreness on the right side of her neck, and mid-back, as well as chronic anxiety.  (*Id.*)  Upon physical examination, Dr. Ulitsky observed spinal tenderness, but noted Thomas exhibited a normal range of motion.  (R. 393.)  Among other things, Dr. Ulitsky referred patient to physical therapy for relief of her neck and back pain, and encouraged her to take Tylenol.  (*Id.*)

On May 2, 2006, claimant presented to the neurological department at the U of C.  (R. 314.)  Her chief complaint was neck and lower back pain.  (*Id.*)  During her examination, Thomas displayed a normal gait, and demonstrated full range of motion in her arms and legs.  (R. 315-16.)  She complained of pain in her cervical and lumbar spine upon movement.  (R. 316.)  Neurologically, Thomas was in tact apart from decreased sensation in her right hand at the C6-7-8 distribution.  (*Id.*)  The examining nurse noted that the previous MRI revealed a thoracic herniated disk.  (*Id.*)  It was recommended that Thomas undergo physical therapy, obtain X-rays of the cervical, thoracic, and lumbar spine, an MRI of the cervical and lumbar spine, and obtain pain medication from the Northern Indiana Neurological Institute or her primary care physician.  (R. 317.)  On May 6, 2006, claimant had an MRI of the cervical and lumbar spine.  (R. 407.)  It showed a reversal of cervical lordosis, but no evidence of spinal

4

stenosis or neural foraminal compromise at the cervical or lumbar levels.  (*Id.*)

On July 7, 2006, Thomas followed up with Dr. Laiteerapong.  (R. 395.)  She reported high levels of stress, depression, insomnia, and chronic pain in her back and left arm.  (*Id.*)  She reported that she was unable to stand or sit for long periods of time. (*Id.*)  She explained that she used to see a physical therapist, but indicated that the stretches seemed to exacerbate her pain so she discontinued treatment.  (*Id.*)  Other than spinal tenderness, the physical examination was normal.  (R. 396.)  Dr. Laiteerapong prescribed Xanax and recommended therapy.  (R. 397.)  Thomas declined a referral for physical or occupational therapy and Dr. Laiteerapong noted that her musculoskeletal symptoms appeared well-controlled.  (*Id.*)

Thomas followed up with Dr. Laiteerapong again on October 10, 2006.  (R. 398.) Thomas reported that she had started seeing a psychiatrist for her depression and was taking Wellbutrin.  (*Id.*)  Her symptoms had improved and she denied suicidal ideation, though she continued to have trouble sleeping.  (*Id.*)  She also continued to complain of neck and back pain stemming from her car accident.  (*Id.*)  She explained that she was having difficulty slicing limes and carrying trays at her waitressing job.  (R. 399.)  Dr. Laiteerapong prescribed Trazodone, and referred Thomas to occupational therapy to learn better strategies for work related pain.  (*Id.*)

Thomas visited the U of C Pain Center on October 18, 2006.  (R. 400.)  She described severe pain in her neck and back that radiates to her extremities, and that is worsened upon ambulation or prolonged sitting or standing.  (*Id.*)  She reported that physical therapy was unsuccessful, as were previous trigger point injections.  (*Id.*)  A physical examination revealed tenderness, pain upon certain movement, and limited

range of motion of the lumbar spine. (R. 401.) Decreased sensation was seen in the right upper extremity, affecting all fingers on that side. (*Id*.) Her gait was antalgic. (*Id*.) Dr. Gita Rupani assessed right upper extremity shoulder and arm pain, likely consistent with thoracic outlet syndrome, low back pain, likely consistent with myofascial pain syndrome, and right lower extremity pain, likely consistent with referred pain from right trochanteric bursitis. (*Id*.) She recommended further lab work, and gave claimant injections, which provided immediate relief. (R. 401-02.)

Records dated January 7, 2007 reveal that Thomas was treated at Saint Margaret for a left ovarian cyst. (R. 325-30.) At that time, she also complained of pain beginning in her neck and radiating to her right arm. (R. 327.)

On March 28, 2007, claimant returned to the Pain Center because she continued to have back pain, shooting down to her right leg, and pain on the right side of her neck and in the back of her shoulder shooting to her hand, and causing numbness, weakness, and tingling. (R. 358.) Recent testing revealed that claimant did not suffer from thoracic outlet syndrome as previously suspected. (*Id*.) Dr. Rupani did note that a recent EMG (not in the record) showed a left cervical radiculopathy. (*Id*.) At the time, she was taking Trileptal, prescribed by the neurology department. (*Id*.) She was not taking any pain medications because they never provided relief. (*Id*.) The physical examination revealed some limited range of motion and pain upon movement. (R. 359.) Dr. Rupani assessed myofascial pain syndrome, cervical radiculopathy, and whiplash. (*Id*.) Despite her hesitance, Dr. Rupani presented claimant with a treatment plan of injections, neuropathic pain medications, and anti-inflammatory medications. (*Id*.)

Claimant's complaints continued at an appointment on April 25, 2007. (R. 361.)

Despite a primarily normal MRI and cervical spine x-rays, Dr. Rupani recommended cervical steroid injections, which were performed on May 16, 2007.  (R. 363-64.)  Shortly thereafter, Thomas reported that the injections provided relief of her neck and back pain, but that she was still experiencing numbness in her arm and hand.  (R. 365.)

On August 2, 2007, claimant returned to see Dr. Laiteerapong.  (R. 366.)  She was prescribed Amitriptyline for her pain and depressive symptoms, but was later switched to Fluoxetine because the Amitriptyline did little for her pain and made her sleepy.  (R. 368, 370.)

As of November 5, 2007, claimant was severely depressed, suffered two to three panic attacks a day, and had not left her apartment much in the last four months.  (R. 371.)  She was taking Vicodin, which did little to ease her severe pain, and she missed her last Pain Center appointment for an injection.  (*Id.*)  Dr. Laiteerapong noted that controlling her psychiatric disorder would improve her myofascial pain.  (R. 373.)  Thomas denied much improvement at her next appointment on November 29, 2007, though she had not been fully compliant in taking her depression medications.  (R. 374.)  As for her pain, she believed the Morphine she recently started taking worked better than the Vicodin.  (*Id.*)  Thomas returned to the Pain Center on December 5, 2007, at which point it was recommended she get another steroid injection.  (R. 377-78.)  However, Dr. Rupani decided against the injection after learning Thomas was pregnant.  (R. 380.)

On December 19, 2007, claimant was feeling better, but was still having problems keeping up with her activities and had difficulty concentrating.  (R. 380.)  She reported that she was dissatisfied with the treatment by Dr. Rupani at the Pain Center.

(*Id.*)  Dr. Laiteerapong recommended that she continue to see her therapist and see a psychiatrist, and that she consider seeing a different Pain Center physician.  (R. 381.)

Thomas did in fact see a different physician at the Pain Center, Dr. Pantle-Fisher, on January 15, 2008.  (R. 383.)  At that time, Thomas reported her pain had severely worsened after she stopped taking her medications due to the pregnancy, and it was only alleviated by lying still.  (*Id.*)  Dr. Pantle-Fisher noted positive trigger points in the right paraspinal cervical and right trapezius muscles.  (*Id.*)  She recommended Lyrica, a fentanyl patch, and ordered further imaging to evaluate for facet joint disease.  (*Id.*) That imaging showed no specific findings to account for Thomas' source of radiculopathy.   (R. 406.)

On March 24, 2008, Thomas arrived in a wheelchair and exhibited a flat affect at her appointment with Dr. Laiteerapong.  (R. 386.)  Dr. Laiteerapong reinforced that claimant should see a psychiatrist.  (R. 387.)  She also noted that Thomas has an affect similar to a patient with fibromyalgia, and referred her to a fibromyaliga support group. (*Id.*)  She encouraged Thomas to stay active and not to use the wheelchair.  (*Id.*) However, she wrote Thomas a note indicating that she suffers from myofascial pain syndrome and is only able to work five hour shifts, two to three times a week.  (R. 426.) Dr. Laiteerapong completed a medical evaluation for the Department of Human Services, indicating that Thomas also suffers from cervical radiculopathy, and possibly fibromyalgia.  (R. 420.)  Though difficult to read, Dr. Laiteerapong appears to indicate that Thomas has a decreased range of motion, walks with a limp, uses a wheelchair, and has more than a 50% reduced capacity in her ability to walk, bend, stand, stoop and sit, among other things.  (R. 421-23.)  She concluded that Thomas could lift no

more than ten pounds, and suffers from mental impairments that cause extreme limitations in her functioning. (R. 423.)

Claimant saw Dr. Ficke at U of C on April 15, 2008 and continued to complain of debilitating pain. (R. 412.) He prescribed Oxycontin and encouraged claimant to follow up with a psychiatrist. (*Id.*) Shortly thereafter, Dr. Sarah Glavin certified that Thomas qualified for a person with disabilities parking placard as she is unable to walk without assistance or an assistive device. (R. 468.) At the same time, Dr. Laiteerapong prescribed Thomas a wheelchair due to myofascial pain syndrome. (R. 467.)

On April 25, 2008, Dr. Laiteerapong participated in a telephone interview with the Bureau of Disability Determination Services. (R. 474.) She explained that Thomas suffered from myofascial pain syndrome, but questioned a fibromyalgia diagnosis because Thomas did not always have positive trigger point tests. (*Id.*) She stated that Thomas suffers from carpal tunnel syndrome, evidenced by weakness in the hands and tenderness at the wrists, which was improving with treatment. (*Id.*) She further explained that she was unsure how compliant claimant has been with her physical therapy referral. (*Id.*) With regard to mental impairments, Dr. Laiteerapong stated that Thomas did not currently see a mental health professional and that many of her symptoms, both physical and mental, were likely caused by outside stressors. (*Id.*) She denied that Thomas was a drug seeking individual or addicted to pain medications. (*Id.*) In Dr. Laiteerapong's opinion, Thomas would be best suited for a job with minimal exertional demands and a mix of fine and gross manipulations such as typing or filing. (*Id.*)

On August 8, 2008, claimant returned to the Pain Center. (R. 513.) Despite

taking three doses of Oxycontin a day, Thomas reported no improvement in her pain. (*Id.*)  Dr. Pantle-Fisher noted that an EMG from April 2008 showed a possible lumbar radiculopathy, but stated that the exam did not strongly rule that in.  (*Id.*)  Thomas had still not sought treatment with a psychiatrist due to insurance problems.  (R. 514.) Thomas was prescribed Dilaudid in lieu of Oxycontin, though it ultimately proved ineffective as well.  (R. 513, 509.)  At Dr. Pantle-Fisher's recommendation, Thomas underwent a lumbar steroid injection on August 19, 2008.  (R. 511.)

On March 24, 2009, Dr. John Yoon saw signs of carpal tunnel syndrome, though he was unsure if symptoms were related to her cervical radiculopathy, so he advised her to follow-up with the orthopedic department.  (R. 592.)  On March 30, 2009, Thomas explained to orthopedic physician Dr. Roderick Bernie that repetitive movements cause pain in both hands and wrists.  (R. 594.)  Dr. Bernie observed a full range of motion, but noted that Thomas reported pain during testing.  (*Id.*)  At Dr. Bernie's request, Thomas underwent an EMG on April 8, 2009.  (R. 589.)  The results were abnormal due to evidence of a mild right median neuropathy at the wrist ("e.g., carpal tunnel syndrome.") (*Id.*)  Also confirmed was the presence of a mild right lower cervical radiculopathy as noted in a March 7, 2007 study.  (*Id.*)  Another abnormal EMG followed on April 23, 2009, because the test results "may represent a chronic right lumbar radiculopathy."  (R. 590.)

On April 29, 2009, Dr. Yoon expressed reluctance in continuing Thomas on heavy opiate medications and Xanax.  (R. 597.)  He also recommended counseling to deal with the underlying psychosocial aspects of Thomas' pain syndrome.  (*Id.*) Thomas followed up with the orthopedic department on April 30, 2009, at which time

she was diagnosed with mild right carpal tunnel syndrome and received a steroid injection, which Dr. Bernie opined may be all the treatment needed to alleviate her nerve compression-related symptoms.  (R. 598.)  By May 26, 2009, Thomas reported to a Pain Center physician that she experienced mild relief with the Percocet previously prescribed by Dr. Yoon.  (R. 600.)  A letter dated June 30, 2008 addressed to Wal-Mart indicates that Thomas can walk for less than ten minutes.  (R. 620.)

In mid-2009, Thomas explained to a physician at U of C that she was recently transported to the ER for treatment after an incident with her boyfriend, though she denied that it was a suicide attempt.  (R. 602.)  At that appointment, she expressed an interest in therapy.  (*Id.*)  The doctor noted tenderness in her back.  (R. 603.)  He expressed grave concern about her recent ER treatment and was hesitant in prescribing further medications.  (*Id.*)  He strongly encouraged psychological or psychiatric care.  (*Id.*)

Thomas' complaints of pain and numbness continued throughout the rest of the year.  (R. 606-11.)  An MRI showed some ostepohytes, but no nerve compression.  (R. 606.)  She again declined a recommendation to participate in physical therapy.  (R. 607.)  She eventually saw a psychiatrist, though claimed that the psychiatrist did not feel like she needed counseling.  (R. 609.)  Following a hospitalization in late October to early November, Thomas' physician stated that she should be limited to working two days a week for five hours or less.  (R. 622.)  On November 10, 2009, Dr. Laiteerapong recommended she walk on the treadmill for thirty minutes a day to treat symptoms of fibromylagia and chronic fatigue system.  (R. 610.)

### 2.    Consulting Physicians

On July 8, 2008, Dr. D. Unversaw completed a Psychiatric Review Technique for affective disorders. (R. 478-91.) Dr. Unversaw indicated that Thomas suffers from a depressive disorder not otherwise specified. (R. 481.) He concluded that Thomas would have mild restrictions of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (R. 488.) He found no episodes of decompensation. (*Id.*) Dr. Unversaw acknowledged Thomas' conflicting statements regarding her ability to perform daily activities, and further noted that she has not received any formal psychiatric treatment. (R. 490.)

Dr. Unversaw also completed a Mental Residual Functional Capacity ("RFC") Assessment. (R. 493-96.) Dr. Unversaw concluded that Thomas was moderately limited in her ability to maintain attention and concentration for extended periods and moderately limited in her "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (R. 493-94.) He found no other significant limitations. (*Id.*) Dr. Unversaw further elaborated that Thomas' limitations in maintaining concentration would be the result of her pain. (R. 495.) Dr. Unversaw stated that any problems at work with tardiness or attendance would appear to be a matter of choice, and that her allegations are partially credible. (*Id.*) Dr. Unversaw's findings were affirmed by Dr. Terry Travis on December 22, 2008. (R. 559-61.)

On December 18, 2008, claimant underwent an Internal Medicine Consultative Examination with Dr. M.S. Patel. (R. 554-58.) She complained of severe pain (10/10)

12

in her neck, lower back, and lower extremities, though she denied taking any pain medications at that time.  (R. 554.)  She stated that she was unable to do any bending, lifting, walking, or climbing.  (*Id.*)  She arrived in a wheelchair, but the doctor noted that she was able to get up, take her shoes off, and step on the scale for height and weight measurements.  (*Id.*)

A physical examination revealed primarily normal results, though a slightly decreased lumbar flexion, and cervical lateral flexion, extension and right rotation were noted.  (R. 555-57.)  Her fine and gross manipulative movements and grip strength were normal.  (R. 556.)  With some prodding, Thomas was able to walk fifty feet slowly, but unassisted.  (R. 557.)  However, Dr. Patel was unable to complete a satisfactory spine and gait examination because claimant stated that she hurt all over.  (*Id.*)  Thomas exhibited a flat, moderately guarded and suspicious affect, and was somewhat angry and anxious.  (*Id.*)  Dr. Patel assessed a history of a motor vehicle accident, polyarthralgia, and fibromyalgia, though he found little in the record in the way of pathology to support those assessments.  (R. 557-58.)  He also assessed a history of major depressive disorder, anxiety, PTSD, and insomnia, and again noted her somewhat abnormal mentation.  (R. 558.)

On December 22, 2008, Dr. Virgilio Pilapil completed a Physical RFC Assessment.  (R. 562-69.)  Dr. Pilapil determined that claimant can occasionally lift twenty pounds and frequently lift ten pounds; can stand or walk with normal breaks for about six hours in a normal eight-hour workday; and can sit for six hours.  (R. 563.)  He found no postural, manipulative, visual, communicative, or environmental limitations.  (R. 564-66.)  Dr. Pilapil commented that claimant's complaints of pain were not

supported by medical evidence and that her allegations of minimal activities of daily living were not fully credible.  (R. 569.)

### C.    Claimant's Testimony

At the time of the hearing, claimant was thirty-eight years old.  (R. 629.)  She explained that she received a degree in paralegal studies.  (*Id.*)  From 2005 to 2007, she worked a variety of part-time jobs, including as a waitress and a bartender.  (R. 634-35.)  She also worked as a program assistant at Roosevelt University from 2003 to 2006, and as a cashier at Home Depot from 2001 to 2003.  (R. 636.)  From 1997 through 2006, claimant worked as a roulette dealer.  (R. 637.)  In 2008, claimant was running her own business, completing forms for pro se litigants.  (R. 630.)  She also worked at Wal-Mart as a cashier during 2008.  (R. 631.)  She stopped working in 2008 due to pain and her inability to concentrate as a result of her medications.  (R. 633.)

Claimant explained that she was in a car accident on June 13, 2005, from which all of her medical problems, both physical and mental, stem.  (R. 639, 641.)  She was transported by ambulance to the hospital.  (R. 640.)  She had no broken bones, but suffered from whiplash.  (*Id.*)  Following the accident, she went to urgent care, underwent physical therapy, and was eventually seen by a neurologist.  (R. 641-42.)  She claims she was diagnosed with chronic pain and fibromyalgia after positive trigger point tests.  (R. 642-43.)

For her back, shoulder and neck pain, claimant takes medication.  (R. 643.)  She has not undergone surgery, but did get injections at some point after the accident.  (R. 643-44.)  She has not participated in physical therapy for over two years.  (R. 644-45.)  According to claimant, she started using her wheelchair for most of the time in July or

August of 2008 when it was prescribed by her doctor because she cannot stand or walk for long periods.  (R. 631-32, 642.)  Claimant still has a valid license, but hasn't driven for several years due to back pain.  (R. 632-33.)

Claimant suffers from insomnia as a result of her pain and depression.  (R. 645.) She testified that she started seeing a psychiatrist in 2006.  (*Id.*)  She continues to see a psychiatrist once a month and is prescribed Prozac, Trazadone, and Klonopin.  (R. 645-46.)  She has also been taking Xanax since the car accident.  (R. 646-47.)  She does not participate in counseling sessions.  (R. 647.)  She testified that in June of 2009, she was admitted to the psychiatric ward for a couple of days following a suicide attempt. (*Id.*)  Claimant also suffers from obsessive compulsive disorder.  (R. 648.)  She often has to re-check that her door is locked or the stove is off.  (*Id.*)  Prior to her physical problems, she kept her house spotless.  (*Id.*)

Claimant lives in an apartment with her boyfriend, his children, and her son.  (R. 649-50.)  The apartment is on the first floor, but there are three stairs leading up to the unit.  (R. 649.)  She does not do any household chores or go grocery shopping, and does not leave the apartment unless she has a doctor's appointment, which is usually once a month.  (R. 651.)  She stays in bed all day because of her pain, and naps for a couple of hours a day.  (R. 652, 659.)  She is tired all of the time and cannot focus because of her medications, in particular, Oxycontin.  (R. 654.)  She does not have family that visits and rarely talks on the phone.  (R. 653-54.)  She has trouble remembering things, and her boyfriend has to remind her to take her medications.  (R. 660.)

Claimant explained that she struggled to pay attention during the hearing

15

because she did not take her medications. (R. 659.) Claimant further explained that she missed a few doctor's appointments because she could not find a ride. (R. 661.) She also stated that she was unable to follow her doctor's orders to stay active, but admitted to never trying to use a walker in lieu of a wheelchair. (*Id.*) She also explained that she could not find a psychiatrist in early 2008 because she was on Medicaid. (R. 661.)

### D.    Medical Expert's Testimony

Medical Expert ("ME") Dr. William Newman also appeared and offered testimony at the hearing before the ALJ regarding his review of the medical records. The ME explained that following claimant's accident in 2005, she suffered a muscle spasm in her neck, and that an MRI showed a slight reversal of the normal cervical lordosis. (R. 663.) However, subsequent tests showed a normal cervical spine. (*Id.*) The ME further explained that a February 2006 MRI of the thoracic spine showed narrowing of the T6 disc space and mild left disc protrusion at T6. (R. 662.) MRIs of the cervical and lumbar spine also from February 2006 were negative. (R. 666.) He did not find any evidence of a shoulder injury. (*Id.*) He noted that an ultrasound from January of 2007 showed a left ovarian cyst. (R. 662.) According to Dr. Newman, claimant's fibromyalgia type pain is caused by psychiatric issues and he did not see any pathology to support inflammatory arthritis. (R. 664-65, 677.) He found no medical reason for claimant to be using a wheelchair. (R. 666.)

In Dr. Newman's opinion, claimant could sustain work for eight hours a day, five days a week. (R. 666.) He would limit her physical exertion to light (lifting twenty pounds occasionally and ten pounds frequently) so as not to further injure the T6 disc.

(R. 667.)  He did not find claimant to require any postural limitations.  (*Id.*)

Claimant's counsel asked the ME about treatment notes in the record indicating that claimant underwent an EMG that revealed "left cervical radiculopathy" and that she suffered from "thoracic outlet syndrome."  (R. 668-69.)  The ME declined to comment on the possible effect of such findings on the RFC because those EMG results were not in the record before him.  (R. 669.)  Similarly, he declined to comment on another EMG that purportedly showed mild right lower cervical radiculopathy.  (R. 672-73.)  The ME also stated that claimant's dosage of pain medication may affect her judgment, but it would not put her to sleep.  (R. 676.)

### E.    Vocational Expert's Testimony

Vocational Expert ("VE") Thomas Dunleavy also offered testimony at the hearing. The VE first classified claimant's past work as performed and as described in the Dictionary of Occupational Titles ("DOT").  He classified her job as a card dealer as light and skilled, her job as a bartender as light and semi-skilled, and her job as a waitress as light and semi-skilled.  (R. 679.)  The VE classified her job as a cashier, as she performed it, as medium and unskilled.  (R. 679-80.)

The ALJ next asked the VE to consider an individual of the claimant's age, education, and work experience, who could occasionally lift twenty pounds, frequently lift ten pounds, and could stand, walk, and sit for six hours in an eight-hour day.  (R. 680.)  When asked if such an individual could perform claimant's past work, the VE explained that the individual could perform all of the jobs except for cashier as claimant performed it, but that she could work as a cashier as described in the DOT (light and unskilled).  (*Id.*)

17

The ALJ then asked the VE to consider a person with the same characteristics, who was limited to simple, routine, and repetitive tasks. (R. 680.) The VE testified that the individual could not perform any of the claimant's past positions, but could work as a cafeteria attendant (3,000 jobs in the area), laundry folder (2,000 jobs), or packager (7,000 jobs). (R. 680-81.) In those positions, a person could be off-task about ten to fifteen percent of the time and still maintain competitive employment. (R. 681-82.) The VE also stated that an individual could be absent no more than ten days a year to maintain competitive employment in those positions. (R. 682.) The VE further testified that a person needing a walker or a wheelchair may not be able to work in one of those three positions, but stated that the use of a cane would not preclude employment. (R. 683.)

Next, the ALJ asked the VE to consider an individual of the claimant's age, education, and work experience who could perform a full range of sedentary work, but only simple, routine, and repetitive tasks. (R. 683-84.) The VE stated that such an individual could not perform any of claimant's past work. (R. 684.) However, the individual could work as a compact assembler (4,000 jobs in the area), sorter (3,000 jobs), or simple cashier (3,000 jobs). (R. 684-86.)

Upon questioning by claimant's counsel, the VE testified that a person who had to take an unscheduled hour-long nap every day would be unemployable. (R. 687.) He also explained that a person who can lift no more than ten pounds and can only occasionally walk, bend, stand, stoop, sit, turn, climb, push, pull, travel, finger or handle would be precluded from employment. (R. 687-88.) Lastly, the VE testified that if a person is only able to work two to three five hour shifts a week, she would not be

employable in the full-time economy.  (R. 689.)

Following the VE's testimony, the ALJ agreed to leave the record open so claimaint could attempt to obtain records from Aunt Marthas, Dr. Laiteerapong's recent treatment records, and EMG reports.  (R. 692.)

## II.     LEGAL ANALYSIS

### A.     Standard of Review

This Court will affirm the ALJ's decision if it is supported by substantial evidence and free from legal error.  42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).  Substantial evidence is more than a scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (*quoting Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)).  We must consider the entire administrative record, but will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner."  *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (*citing Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).  This Court will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues."  *Lopez*, 336 F.3d at 539 (*quoting Steele*, 290 F.3d at 940).

In addition, while the ALJ is not required to address every piece of evidence, she "must build an accurate and logical bridge from the evidence to her conclusion."  *Clifford*, 227 F.3d at 872.  The ALJ must "sufficiently articulate her assessment of the evidence to assure us that the ALJ considered the important evidence ... [and to enable]

us to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (*quoting Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

### B.   Analysis under the Social Security Act

In order to qualify for SSI or DIB, a claimant must be "disabled" under the Act.  A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months."  42 U .S.C. § 423(d)(1)(A).  In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy."  *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  The claimant has the burden of establishing a disability at steps one through four.  *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001).  If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy."  *Id.* at 886.

The ALJ applied this five-step analysis.  At step one, the ALJ found that claimant had not engaged in substantial gainful activity since her alleged onset date of October 2, 2005.  (R. 11.)  At step two, the ALJ concluded that claimant suffered from the following severe impairments: degenerative disc disease, depression, and anxiety.  (*Id.*)

Next, at step three, the ALJ determined that claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 12-13.) The ALJ then concluded that claimant maintained the RFC to perform sedentary work as defined in 20 C.F.R.404.1567(a) and 416.927(a). (R. 13-19.) The ALJ further concluded that the claimant is limited to performing simple, routine, and repetitive tasks. (*Id.*)

Based on the RFC assessment, the ALJ determined at step four that the claimant was unable to perform past relevant work. (R. 19-20.) Lastly, at step five, the ALJ found that given claimant's age, education, work experience, and RFC, there are jobs in significant numbers in the national economy that claimant could perform such as impact assembler, sorter, or cashier. (R. 20-21.) As a result, the ALJ found that claimant has not been under a disability from October 2, 2005 though the date of her decision. (R. 21.)

Thomas now argues that the ALJ erred by (1) failing to include claimant's carpal tunnel syndrome among her severe impairments; (2) improperly analyzing whether claimant met or equaled a listing; (3) improperly assessing claimant's credibility; (4) improperly assessing claimant's RFC; and (5) failing to include all of her findings in the questions to the VE.

### C. The ALJ's Decision Not to Include Claimant's Carpal Tunnel Syndrome Among Her Severe Impairments Does Not Require Remand.

Thomas first argues that the ALJ committed reversible error when, at step two, she declined to find that her carpal tunnel syndrome was a severe impairment. At step two, the ALJ is required to assess the medical severity of a claimant's impairments. 20

21

C.F.R. § 404.1520(a)(4)(ii). "[A]n impairment or combination of impairments is considered 'severe' if it significantly limits an individual's physical or mental abilities to do basic work activities." Social Security Ruling ("SSR") 96-3p, 1996 WL 374181 at *1. However, it is well settled that step two of the ALJ's analysis is "merely a threshold requirement." *Castile v. Astrue*, 617 F.3d 923, 927 (7th Cir. 2010) (*quoting Hickman v. Apfel*, 187 F.3d 683, 688 (7th Cir. 1999)). "As long as the ALJ determines that the claimant has one severe impairment, the ALJ will proceed to the remaining steps of the evaluation process." *Castille*, 617 F.3d at 926-27. Thus, "the determination of whether a particular impairment is severe or not is of no consequence to the outcome of the case where ... the ALJ recognized other severe impairments and so proceeded with the full evaluation process." *Willis v. Astrue*, 10-207-CJP, 2011 WL 2607042, at *9 (S.D. Ill. July 1, 2011).

Here, where the ALJ found Thomas to suffer from certain severe impairments, her decision not to include carpal tunnel in that list does not alone amount to reversible error. *See Boucek v. Astrue*, No. 08 C 5152, 2010 WL 2491362, at *5 (N.D. Ill. June 16, 2010) ("where ALJ finds claimant suffers from severe impairments, failure to find other condition constituted a severe impairment could not constitute reversible error") (citation omitted).

### D. The ALJ Properly Analyzed Whether Claimant Met or Equaled a Listing.

Next, claimant challenges the ALJ's finding at step three that her impairments did not meet or medically equal a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1. It is undisputed that the claimant bears the burden to show that her impairments meet or

equal a listed impairment.  *Ribaudo v. Barnhart*, 458 F.3d 580*, 583*  (7th Cir. 2006) (*citing Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999)).  To meet this burden, the claimant must satisfy all of the criteria of the listed impairment.  *Id.*

Here, after examining Listings 1.02 (major dysfunction of a joint), 1.04 (disorders of the spine), 12.04 (affective disorders), and 12.06 (anxiety disorders), the ALJ concluded that Thomas' impairments did not satisfy those or any other Listing. Claimant takes issue with the ALJ's statement that "[n]o treating or examining physician has identified findings equivalent in severity to the criteria of any listed impairment..." (R. 12.)  Citing Dr. Laiteerapong's April 21, 2008 medical evaluation, claimant contends that her treating physician did in fact conclude that she suffers from "extreme limitations" in performing activities of daily living, social functioning, and concentration persistence, and pace, and that she suffered four or more episodes of decompensation in a period of twelve months, which would support a finding that she satisfies one of the Listings 12.04 and 12.06.  (R. 423.)  However, later in the opinion, the ALJ articulated why she gave Dr. Laiteerapong's evaluation minimal weight.  Thus, the ALJ's decision not to cite that evidence in her step three analysis does not require reversal.

Claimant also takes issue with the ALJ's misrepresentation at step three that she had not been "hospitalized due to her mental symptoms."  (R. 13.)  We first note that the ALJ did appear to correct this misrepresentation later in her opinion when she acknowledged claimant's testimony that she was admitted to the hospital to receive counseling.  (R. 14.)  Further, even considering that hospitalization (of which there are no actual records now, nor before the ALJ), the medical record before us does not contain records demonstrating "repeated episodes of decompensation" as required to

meet Listings 12.04 or 12.06.  For these reasons, we find no reversible error in the ALJ's step three analysis.

### E.    The ALJ's Credibility Determination is Flawed.

Claimant next contends that the ALJ's credibility finding was flawed because the ALJ (1) used meaningless boilerplate language; and (2) failed to discuss the side effects of claimant's medications.  Indeed, once the ALJ determines that a claimant's impairments could reasonably be expected to produce the claimant's symptoms, the ALJ must evaluate "the intensity, persistence, or functionally limiting effects" of the claimant's symptoms.  SSR 96-7p, 1996 WL 374186, at *2.  When statements about such effects are not substantiated by objective medical evidence, the ALJ must make a credibility determination based on the entire case record.  *Id.*  In making a credibility determination, the ALJ should consider the following factors in addition to objective medical evidence: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of medication the claimant takes to alleviate pain; (5) treatment, other than medication, that the individual has received for relief of pain; (6) any other measures the individual uses to relieve pain; (7) and any other factors concerning the individual's functional limitations.  *Id.* at *3.

It is well settled that the court must afford the ALJ's credibility determination special deference because the ALJ is "in the best position to see and hear the witnesses and assess their forthrightness."  *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).  Consequently, we will reverse a credibility determination only if it is "patently

24

wrong." *Zurawski*, 245 F.3d at 887.  An ALJ's credibility determination is patently wrong if it lacks "any explanation or support."  *Elder,* 529 F.3d at 413-14; *see also* SSR 96-7p, 1996 WL 374186, at *2 (The ALJ's decision must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.").

Here, after utilizing the often frowned upon boilerplate language to support her credibility assessment, *see Bjornson v. Astrue*, 671 F.3d 640, 645-46 (7th Cir. 2012), the ALJ offered little more than a recitation of the medical evidence.  Her analysis consists primarily of implications that the objective medical records do not support claimant's testimony regarding minimal daily activities and debilitating pain.  Unfortunately, an ALJ may not discredit a claimant's complaints of pain and limitations solely because they are not substantiated by objective medical evidence.  SSR 96-7p, 1996 WL 374186, at *1.

Also concerning is the ALJ's reliance on claimant's lack of significant mental health treatment.  An ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide."  *Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir. 2013) (*quoting* SSR 96-7p, 1996 WL 374186, at *7).  Here, before citing to the lack of mental health treatment, the ALJ should have acknowledged evidence in the record, as well as the claimant's testimony, indicating that she was having difficulty finding a psychiatrist due to insurance problems.  (*See* R. 514, 661.)  And, lastly, as the claimant points out, the ALJ failed to adequately

address claimant's testimony regarding the side effects of her medication, or to otherwise explain why she chose to discredit that testimony.

For these reasons, we find that the ALJ's credibility assessment lacks adequate explanation and leaves us unable to trace the path of her reasoning. As a result, remand is required. Having reached this conclusion, and with the understanding that a new RFC assessment and/or interpretation of the VE's testimony may be required on remand, we need not comment on the remaining issues raised by the claimant. However, it is worth noting that contrary to the claimant's assertion, the ALJ did in fact provide adequate reasoning for why she afforded the opinion of claimant's treating physician, Dr. Laiteerapong, minimal weight.

## III. CONCLUSION

For the reasons set forth above, claimant's motion for summary judgment is granted in part and the Commissioner's cross-motion for summary judgment is denied. This case is remanded to the Social Security Administration for further proceedings consistent with this opinion. It is so ordered.

**ENTERED:**

_____
**MICHAEL T. MASON**
**United States Magistrate Judge**

**Dated:** **September 5, 2014**